IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| SEMCRUDE, L.P., et al., | ) | Chapter 11 |
| | ) | Bank. No. 08-11525 (BLS) |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| J. ARON & COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-cv-41 (SLR) |
| | ) | Civ. No. 14-cv-357 (SLR) |
| SEMCRUDE, L.P., et al., | ) | Adv. No. 09-50038 |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| BP OIL SUPPLY COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-cv-40 (SLR) |
| | ) | Adv. No. 09-50105 |
| SEMCRUDE, L.P., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ANSTINE & MUSGROVE, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-cv-39 (SLR) |
| | ) | Adv. No. 10-51797 |
| J. ARON & COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ARROW OIL & GAS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-cv-38 (SLR) |
| | ) | Adv. No. 10-51825 |
| J. ARON & COMPANY, et al., | ) | |



Defendants.                )
                           )
─────────────────────────  )
                           )
IC-CO, INC., *et al.*,     )
                           )
        Plaintiffs,        )
                           )
        v.                 )        Civ. No. 14-cv-358 (SLR)
                           )        Adv. No. 11-51773
J. ARON & COMPANY,         )
                           )
        Defendants.        )
                           )
─────────────────────────  )
                           )
ORANGE CREEK ENERGY LPV, L.P., )
                           )
        Plaintiff,         )
                           )
        v.                 )        Civ. No. 14-cv-913 (SLR)
                           )        Adv. No. 11-53148
J. ARON & COMPANY, *et al.*, )
                           )
        Defendants.        )

Adam G. Landis, Esquire, and Matthew B. McGuire, Esquire, of Landis Rath & Cobb, L.L.P.,
Wilmington, Delaware; Peter S. Goodman, Esquire, and Michael R. Carney, Esquire, of
McKool Smith, P.C., New York, New York; Lewis T. LeClair, Esquire, of McKool Smith,
P.C., Dallas, Texas; Hugh Ray, Esquire, and Basil A. Umari, Esquire, of McKool Smith,
P.C., Houston, Texas.  Counsel for the Associated Producers.

Jennifer R. Hoover, Esquire, of Benesch, Friedlander, Coplan & Aronoff, L.L.P., Wilmington,
Delaware; James S. Carr, Esquire, Thomas B. Kinzler, Esquire, David Zalman, Esquire, and
Melissa E. Byroade, Esquire, of Kelley Drye & Warren, L.L.P., New York, New York.
Counsel for BP Oil Supply Company.

Don A. Beskrone, Esquire, and Amanda Winfree Herrmann, Esquire, of Ashby & Geddes,
P.A., Wilmington, Delaware; Thomas J. Moloney, Esquire, and Boaz S. Morag, Esquire, of
Cleary Gottlieb Steen & Hamilton, L.L.P., New York, New York.  Counsel for J. Aron &
Company.

Duane D. Werb, Esquire, of Werb & Sullivan, Wilmington, Delaware; Hartley B. Martyn of
Martyn & Associates, Cleveland, Ohio.  Counsel for IC-CO, Inc.

## MEMORANDUM OPINION

Dated: July 30, 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

The present matter is a dispute between a group of oil producers ("the Producers")[1] that sold oil to SemCrude, L.P., and two downstream purchasers ("the Purchasers") that

---

[1] Defined term also includes Orange Creek Energy LPV, L.P., which filed a separate objection that fully incorporated and adopted the Producers' arguments. (Civ. No. 14-913, D.I. 2) All defendants in this case include: Anstine & Musgrove Inc.; Arrow Oil & Gas, Inc.; Bank of America NA as DIP Agent, as agent for Prepetition Secured Lenders and as agent for Prepetition Secured Parties; Beasley Oil Company; Benson Mineral Group, Inc.; Blake Exploration L.L.C.; Braden-Deem Inc. C&S Oil/Cross Properties, Inc.; CMX Inc.; Casey Musgrove Oil Co., Inc.; Castelli Exploration, Inc.; Central Operating, Inc.; Chemical Petroleum Exchange, Inc.; Chesapeake Energy Marketing, Inc.; Clark Exploration Company; Clipper Energy, L.L.C.; Coral Coast Petroleum, L.C.; Crawley Petroleum Corporation; D E Exploration, Inc.; DC Energy, Inc.; DK Operating, Inc.; Davis Petroleum, Inc.; Daystar Petroleum, Inc.; Double Eagle Exploration, Inc.; Drillers & Producers, Inc.; Duncan Oil Properties, Inc.; Eagle Creek Corporation; Eaglwing, L.P.; FG Holl Company, L.L.C.; Fairfield Oil & Gas Corp.; GMX Resources, Inc.; GRA EX, L.L.C.; Gloco, L.L.C.; Grayson Pipeline, L.L.C.; Great Plains Energy, Inc.; Greyhawk Gas Storage Company, L.L.C.; Ground Development Co.; H I, Inc.; Herman L. Loeb, L.L.C.; Huntington Energy, L.L.C.; IC-CO, Inc.; J&D Investment Company; JMA Energy Company, L.L.C.; Jack Exploration, Inc.; John Does 1 to 1,000; KC Asphalt, L.L.C.; KLM Exploration Company, Inc.; Kahan and Associates, Inc.; Keith F. Walker Oil & Gas Company, L.L.C.; Kingery Drilling Co.; L&J Oil Properties, Inc.; LCS Production Company; LD Drilling, Inc.; Lance Ruffel Oil & Gas Corp.; Landmark Resources, Inc.; Lario Oil & Gas Company; Little Bear Resources, Inc.; Luke Oil Company; McCoy Petroleum Corporation; McGines Oil Company of Kansas, Inc.; Mesa Exploration Co, Inc.; Mid-Continent Energy Corporation; Midwest Energy, Inc.; Mint Limited Partnership; Molitor Oil, Inc.; Mull Drilling Company, Inc.; Murfin Drilling Company, Inc.; Musgrove Energy, Inc.; Mustang Fuel Corp.; Calvin Noah; Nytex Energy, L.L.C.; Oil Company of America, Inc.; Oklahoma Oil & Gas Management, Inc.; Orange Creek Energy L.P.V, L.P.; Pickrell Drilling Company, Inc.; Platte Valley Oil Company, Inc.; Prolific Resources, L.L.C.; RAMA Operating Co., Inc.; RJ Sperry Co.; Randon Production Company, Inc.; Red Oak Energy, Inc.; Ritchie Exploration, Inc.; Rosewood Resources, Inc.; Ross Hoener, Inc.; Samson Contour Energy E&P, L.L.C.; Samson Lone Star, L.L.C.; Samson Resources Company; Samson Resources Corp.; Seeker, L.L.C.; SemCanada II, L.P.; SemCanada, L.P.; SemCrude, L.P.; SemCrude Pipeline, L.L.C.; SemFuel, L.P.; SemFuel Transport, L.L.C.; SemGas Gathering, L.L.C.; SemGas, L.P.; SemGas Storage, L.L.C.; SemGroup Asia, L.L.C.; SemGroup Finance Corp.; SemGroup, L.P.; SemKan, L.L.C.; SemManagement, L.L.C.; SemMaterials, L.P.; SemMaterials Vietnam, L.L.C.; SemOperating GP, L.L.C.; SemTrucking, L.P.; Short & Short, L.L.C.; Snyder Partners; Special Energy Corporation; St. Mary Land & Exploration

subsequently repurchased that same oil from SemCrude. The Purchasers—BP Oil Supply Company ("BP") and J. Aron & Company ("J. Aron")—initiated this dispute by filing two adversary proceedings in SemCrude's chapter 11 bankruptcy case. (Adv. No. 09-50038, D.I. 1; Adv. No. 09-50105, D.I. 1) The adversary complaints sought various forms of declaratory relief with respect to the Purchasers' rights in the disputed oil and their obligations (if any) to the Producers. After the parties completed discovery on several discrete factual issues, the bankruptcy court issued proposed findings of fact and conclusions of law ("FFCL") pursuant to 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033(a). It recommended summary judgment in the Purchasers' favor on all counts of their two adversary complaints. The Producers timely filed objections to the proposed FFCL, and the Purchasers have responded. The proposed FFCL is now properly before this court to render final judgment.

## II. BACKGROUND

On July 22, 2008, SemCrude and related entities ("the Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (Bank. No. 08-11525, D.I. 1). The Debtors provided midstream oil and gas services, primarily aggregating oil and gas from producers and

---

Company; St. Mary Land & Exploration, Inc.; Stephens & Johnson Operating Co.; Steuben Development Company, L.L.C.; TGT Petroleum Corporation; Tempest Energy Resources, L.P.; Tex-Ok Energy Limited Partnership; Thoroughbred Associates; Three-D Resources, Inc.; Thunder Oil and Gas, L.L.C.; Tripledee Drilling Co., Inc.; Tripower Resources, Inc.; VJI Natural Resources, Inc.; Veenker Resources, Inc.; Vess Oil Corporation; Viking Resources, Inc.; Vincent Oil Corporation; WD Short Oil Co., L.L.C.; Wayne Thomas Oil and Gas; Weinkauf Petroleum Inc.; WeL.L.C.o Energy, Inc.; Wellstar Corporation; Wheeler Oil Company; White Exploration, Inc.; White Pine Petroleum Corporation; William R. Earnhardt Co.; and XTO Energy, Inc.

reselling the product to downstream purchasers. (J. Aron at 5)[2]  The Debtors, through their

CEO Tom Kivisto, traded financial oil derivatives on the New York Mercantile Exchange and

on over-the-counter markets. (BP at 5)  Kivisto engaged in a trading strategy that proved

unsuccessful, and eventually led to a liquidity crisis that caused the Debtors to file

bankruptcy. (Prod. at 9–10)

Although complicated, Kivisto's trading strategy in essence involved betting that the

price of a barrel of oil would remain within a historical normalized range. (Prod. R., Ex. 8 at

6)  He executed this strategy by selling a variety of options contracts, the value of which

depended on the underlying price of a barrel of oil.  By selling these options contracts, the

counterparty paid the Debtors an upfront premium—usually worth millions of dollars. (Id. at

8–9)  In return for this premium, however, the options contract bound the Debtors to sell oil[3]

at a pre-determined contract price on a pre-determined future date (the expiration date).  If

the price of oil exceeded that pre-determined price on that expiration date, the Debtors

would be liable to the counterparty for that difference.  On the other hand, if the price of oil

remained below that contract price, the option contract expired worthless and the Debtors

profited from the premium.  If one of the derivatives was about to expire and realize a loss

for the Debtors, Kivisto's strategy called for selling more options contracts in larger

quantities and using the new premiums to unwind those earlier positions. (Id. at 76)  This

strategy—referred to as "rolling"—prevented the Debtors from realizing present losses on

the options trading, but increased exponentially their potential exposure to losses in the

---

[2] The court will cite the Associated Producers' Objection to the Proposed Findings of
Fact and Conclusions of Law as (Prod. at __), J. Aron's Omnibus Response as (J. Aron at
__), BP Oil Supply Company's Response as (BP at __), and the Producers' Reply as (Prod.
R. at __).  Other "D.I." references will be to the docket for Civ. No. 14-913.

[3] Although the Debtors could have simply delivered barrels of oil to cover these
options, they sold more options contracts than the amount of daily inventory that they held.

future. (*Id.* at 76–77) By July 2009, the Debtors' exposure had ballooned to almost $3 billion. (*Id.* at 82)

J. Aron is a commodities trading company that not only purchased physical oil from the Debtors, but also traded financial derivatives with them. (Prod. at 10–11) J. Aron and the Debtors entered into an ISDA Master Agreement in November 2007. (J. Aron at 7) This agreement covered the parties' physical and derivative trading of oil and gas products. (Prod. at 10; J. Aron at 7) Pursuant to industry custom, the Debtors and J. Aron agreed that J. Aron would pay for all physical oil purchases on the 20th day of the month following purchase.[4] Simultaneously, the Purchasers determined the Debtors' financial derivatives exposure through a method known as "marked-to-market." (J. Aron at 7) According to this method, J. Aron valued its potential exposure under those derivatives by ascribing them a value based on market value of a barrel of oil at the end of each business day. (*Id.*) Depending on this daily figure, the Debtors agreed to pledge a certain amount of cash collateral to J. Aron on a daily basis in a margin account that represented a percentage of the total exposure. (*Id.*; *see* Prod. R., Ex. 8 at 7)

Because J. Aron also sold oil to the Debtors on credit, the parties agreed to a "netting" arrangement for physical oil sales. (J. Aron at 8) On a monthly basis, the parties would simply cancel out matching obligations rather than paying each other the full outstanding amounts in cash. (*Id.*) This created a more efficient transaction, which required much less liquidity. For example, if J. Aron and the Debtors owed each other $9 million and $10 million for monthly oil purchases, respectively, they would cancel out $9 million worth of countervailing receivables and J. Aron would pay $1 million in cash on the remaining balance. (*Id.*) Once J. Aron became aware of the Debtors' liquidity troubles,

---

[4] This industry convention also applied to the Producers' sale of oil to the Debtors.

4

however, the parties executed an amendment to their initial agreement on June 12, 2008. This amendment permitted J. Aron to withhold a portion of the amount it owed to the Debtors for purchases of physical oil, and place it in a cash collateral account to cover the Debtor's margin call that was projected to arise the following day. (Prod. at 16; J. Aron at 9) J. Aron also maintained a "net payable" position with respect to the Debtors in order to further protect against default exposure—i.e., J. Aron would purchase enough oil such that it always owed the Debtors more for the physical oil than the Debtors owed J. Aron. (Prod. at 15; J. Aron at 9)

On July 17, 2008, J. Aron demanded adequate assurance of performance from the Debtors. (J. Aron at 9)  The Debtors did not provide such assurance, which constituted an event of default under the ISDA Master Agreement. (*Id.*)  In accordance with the default provisions of that agreement, J. Aron could then demand an Early Termination Payment calculated as the outstanding exposure on the financial derivatives contracts. (Prod., Ex. 13 at § 6)  In addition to netting out physical oil accounts, the parties' various agreements also provided for "cross-product netting," where the outstanding amounts due for the physical oil would be netted against the outstanding amount due for the financial derivatives, to calculate a final balance. (J. Aron at 9)[5] According to this final netting, the parties agreed that J. Aron owed approximately $90 million. (Prod. at 17; J. Aron at 9)

BP is an international energy company that also engaged in physical oil and financial derivative trades with the Debtors. (BP at 5)  For the purpose of this dispute, BP's relationship with the Debtors was functionally equivalent to that of J. Aron's.  In April 2008,

---

[5] As an extension of the earlier example, *see supra* p. 5, if the Debtors defaulted, they would be able to net their Early Termination Payment against the $1 million that J. Aron owed for the monthly oil purchases.

the parties executed several agreements with the Debtors, including an ISDA Master

Agreement. (*Id.* at 6)  In June 2008, the parties bought various quantities of oil from each

other. (*Id.* at 9–10)  BP had also sold financial derivatives products to the Debtors.  The

Debtors' bankruptcy filing constituted an event of default under the parties' agreements. (*Id.*

at 11)  These agreements set forth the same netting procedures as J. Aron's agreements:

the parties first netted out the physical oil obligations, then netted that result against an

Early Termination Payment on the financial derivatives, to calculate a total net payment.

(*Id.*)  The parties agreed that BP owed the Debtors approximately $10 million for the total

net payment. (*Id.*; Prod. at 25)

When the Debtors filed bankruptcy, they had not yet paid the Producers for oil they

purchased on credit in June and July of 2008.  Thousands of producers filed claims in the

bankruptcy court for the oil they delivered within the fifty-one days prior to the Debtors'

bankruptcy. (J. Aron at 15)  The Producers also sought to file adversary proceedings

against the Purchasers, raising various common law and statutory claims.  They alleged

that the Purchasers violated the Producers' liens in the oil and/or conspired with the Debtors

in order to defraud the Producers.  To ease the procedural burden of the various claims, the

bankruptcy court ordered the parties to file separate adversary proceedings for each of the

eight states in which the Producers were located ("the Producer Adversaries"). (*Id.* at 16)

This procedure allowed the bankruptcy court to determine threshold questions of state law

that would govern the rights of the Producers, Purchasers, and creditors. (*Id.*)  Specifically,

the purpose was for the parties to seek "declaratory judgment establishing (i) the state law

lien and trust rights, if any, afforded to the Producers who sold product to the Debtors; and

(ii) the priority of these Producers' rights relative to the Banks' asserted perfected security

interests in the Debtors' existing and after-acquired inventory." *In re SemCrude, L.P.*, 504

B.R. 39, 47 (Bankr. D. Del. 2013).

6

While the Producer Adversaries were pending, the Purchasers filed adversary proceedings (the "Tender Adversaries") in the bankruptcy court seeking to tender the final net amount they owed to the Debtors under their trading agreements.  (J. Aron at 17; BP at 14)  The Tender Adversaries also sought declaratory judgment that this tendered amount fully satisfied and released the Purchasers from any claims of the Debtors and the Producers in the disputed oil.  (J. Aron at 17; BP at 14)  On June 2, 2009, the bankruptcy court entered an order (the "Tender Order") directing that the approximately $122 million tendered (the "Tendered Funds") be held in escrow pending the resolution of the Tender Adversaries.[6]  The Purchasers then filed motions for summary judgment on the Tender Adversaries.  The bankruptcy court delayed ruling on these motions to permit discovery on several discrete issues.  Following discovery, the Purchasers renewed their motions for summary judgment.  On June 28, 2013, the bankruptcy court issued its proposed FFCL that recommended summary judgment in favor of the Purchasers.  The FFCL included the following recommendations:

- The Purchasers took the oil free and clear of the Producers' liens as buyers for value pursuant to U.C.C. § 9-317.  *In re SemCrude, L.P.*, 504 B.R. at 52.

- Alternatively, the Purchasers took the oil free and clear of the Producers' liens as buyers in the ordinary course of business pursuant to U.C.C. § 9-320.  *Id.* at 68.

---

[6] Per agreement of the parties, the bankruptcy court ordered these funds to be released to aid the Debtors' confirmation of a plan.  The confirmation plan disbursed these funds to the Producers to pay for oil and gas delivered to the Debtors between July 2 and July 21, 2008.  The Bankruptcy Code provides special protection to goods delivered to a debtor within the 20-day window immediately preceding the bankruptcy.  11 U.S.C. § 503(b)(9).

- The Producers' common law tort and equitable claims for conversion, tortious interference, unjust enrichment, money-had-and-received, fraud, and accounting and disgorgement failed as a matter of law. *Id.* at 70.

- The Producers specifically located in Oklahoma could not state tort claims under the Oklahoma Production Revenue Standards Act. *Id.*

The Producers object to each of those findings. They also contend that the bankruptcy court did not have the necessary related-to jurisdiction to enter the FFCL.

### III. STANDARDS OF REVIEW

Once a bankruptcy court determines that a pending matter is not a core proceeding under § 157(b)(2), but is nonetheless related to a case under title 11, it shall submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1). Thereafter, "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." *Id.* The Federal Rules of Bankruptcy Procedure provide that:

> The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

Fed. R. Bankr. P. 9033(d). "In conducting a de novo review, the Court must consider all of the Bankruptcy Court's findings and conclusions and afford them no presumption of validity." *In re Montgomery Ward & Co.*, 2004 WL 323095, at \*1 (D. Del. Feb. 13, 2004), *rev'd on other grounds*, 428 F.3d 154 (3d Cir. 2005).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the

absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.,* 415 U.S. 475, 586 n.10 (1986). A party asserting that a fact cannot be—or,

alternatively, is—genuinely disputed must be supported either by citing to "particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for the purposes of the motions

only), admissions, interrogatory answers, or other materials," or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then

"come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita,* 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all

reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530

U.S. 133, 150 (2000).

     To defeat a motion for summary judgment, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita,*

475 U.S. at 586–87; *see also Podohnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d

Cir.2005) (stating party opposing summary judgment "must present more than just bare

assertions, conclusory allegations or suspicions to show the existence of a genuine issue")

(internal quotation marks omitted). Although the "mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment," a factual dispute is genuine where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,

Inc.,* 477 U.S. 242, 247–48 (1986). "If the evidence is merely colorable, or is not

9

significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. DISCUSSION

### A. Objection 1: Subject matter jurisdiction

The Producers first object to the bankruptcy court's finding that it had related to subject matter jurisdiction under 28 U.S.C. § 1334(b). (Prod. at 32) They contend that the Purchasers' claims in the Tender Adversary complaints do not have any "conceivable effect" on the Debtors' bankruptcy estate. *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (establishing that a lawsuit must have a conceivable effect on the bankruptcy estate in order for a bankruptcy court to have related to jurisdiction). The Producers argue that the bankruptcy court based its finding of jurisdiction solely on the Tender Adversaries' indemnity claim against the Debtors. In their view, this indemnity claim is contingent upon filing another intervening lawsuit and, therefore, does not have a direct conceivable effect on the bankruptcy estate.

According to *In re W.R. Grace*, 591 F.3d 164, 173 (3d Cir. 2009), if an initial lawsuit requires another intervening lawsuit to directly impact the bankruptcy estate, the initial lawsuit does not have a "conceivable effect" on that estate. The Producers' argument focuses narrowly on only one claim in the Tender Adversaries and ignores the several claims for declaratory relief that do directly impact the estate. These claims seek declaratory judgment on the following issues:

> (a) [T]he Trading Agreement is valid and enforceable;
> (b) J. Aron's rights to deduct from the Tendered Amount and to recover continuing legal fees and costs ... are valid and enforceable;

10

(c) [T]he Trading Agreement provides rights of netting and recoupment to determine the sum total amount of any and all of J. Aron's financial obligations to the Defendants, and that J. Aron has no obligation to pay any more than the Tendered Amount or any portion thereof;

(d) Defendants have no lien or trust rights nor any other actionable claims (including, without limitation, claims against sums received by J. Aron upon its sale of oil acquired from SemGroup) as a matter of law and of fact, and that J. Aron has complete defenses to any such lien, trust or other claims, or such claims are unenforceable against J. Aron;

(e) J. Aron's rights arising under its Trading Agreement are superior to those of any Defendant or other creditor, whether secured or unsecured;

(f) J. Aron's Tendered Amount constitutes full and faithful performance under the Trading Agreement, and shall be the sole amount due, in full satisfaction thereof, and thereby extinguishes and resolves without further recourse any contingent or non-contingent claims or any other cause of action against J. Aron by [any other party], that J. Aron has no obligation to pay more than once the Tendered Amount or any portion thereof.

*In re SemCrude, L.P.*, 428 B.R. 82, 94–95 (Bankr. D. Del. 2010) (internal quotation marks omitted).  The bankruptcy court correctly reasoned that because the Tender Adversaries sought to define competing rights to the Tendered Funds turned over to the Debtors' estate, the adjudication of those rights would necessarily affect the rights of the Debtors' estate to those funds.  *Id.* at 99.  These claims, therefore, do not require a subsequent intervening lawsuit because, "[i]f the Court were to disallow netting or recoupment, for example, or were it to order that the Downstream Purchasers tender more or less than they proposed, the Debtors' estate would be directly affected . . . ."  *In re SemCrude, L.P.*, 428 B.R. at 99.  This would also "necessarily affect the distribution to which other creditors are entitled under the Plan."  *Id.*

The Purchasers' Tender Adversaries would have a direct impact on the Debtors' bankruptcy estate.  Accordingly, this court finds that the bankruptcy court did have "related to" subject matter jurisdiction over the instant disputes.

**B. Objection 2: Fraud**

The Producers claim that the bankruptcy court improperly recommended summary judgment in the Purchasers' favor on the fraud-based[7] claims. (Prod. at 38)  They allege that the Purchasers defrauded them by engaging in a scheme to trick the Debtors into gambling on financial derivatives and using unpaid-for oil as collateral. (*Id.*)  Initially, they contend that the Purchasers did not actually move for summary judgment on these claims. (*Id.*)  The Purchasers disagree and point to their briefs in support of their renewed motions for summary judgment. (BP at 36; J. Aron at 51)  Regardless of whether the Purchasers explicitly moved for summary judgment on the fraud claims, the court is convinced that the record was sufficiently developed for the bankruptcy court to propose a finding of summary judgment sua sponte.

"[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).  A court may not grant summary judgment sua sponte "unless the court gives notice and an opportunity to oppose summary judgment." *Otis Elevator Co. v. George Washington Hotel Corp.*, 27 F.3d 903, 910 (3d Cir. 1994).  In this context, "notice is satisfied if the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004) (internal quotations omitted).

---

[7] These claims include fraud, aiding and abetting fraud, and conspiracy to commit fraud.

The court finds that the Producers had reason to believe that the bankruptcy court might reach the fraud claims. First, as early as September 2010, BP formally called into question the legal sufficiency of the Debtors' fraud claims in its Motion to Dismiss. (Adv. No. 09-50105, D.I. 326 at 9–12) BP then moved for summary judgment on the causation element of this fraud claim in both of its motions for summary judgment. (Id., D.I. 328 at 27, D.I. 702 at 5 n. 11) Although J. Aron's brief merely incorporated BP's arguments by reference, it raised the same fraud defenses that BP raised, thus providing further notice of the relevant issues. See Couden v. Duffy, 446 F.3d 483, 500 (3d Cir. 2006) (recognizing that court granting summary judgment sua sponte for one co-defendant was proper when other co-defendant had moved for summary judgment on the same defense).

The Producers also had an opportunity to oppose summary judgment. The Purchasers' briefs raised defenses in their motions for summary judgment that addressed their good faith, their knowledge of the Producers' liens, and their knowledge of the applicable lien statutes. These issues all cut to the heart of the Producers' theory of fraud. See Turner v. Corr. Med. Servs., 494 F. Supp. 2d 281, 283 (D. Del. 2007) (similar issues between claims may provide notice that both claims are subject to summary judgment). The parties then debated the fraud claims at length during oral argument before the bankruptcy court. (D.I. 10-1 at 675–84) The Producers' present objection cites to numerous depositions, transcripts of witness testimony, and other evidence that they argue suggest fraud. (Prod. at 40–42; see In re SemCrude, L.P., 504 B.R. at 70) This evidence was available to the Producers in the litigation below. The Producers further acknowledge that the parties had "previously exchanged . . . expert declarations dealing specifically with the fraud claims and aiding and abetting claims." (Prod. R. at 34) Consequently, the court concludes that the Producers had reason to believe that the bankruptcy court would rule on the fraud claim and that they received a fair opportunity to address those claims.

13

Next, the Producers contend that the bankruptcy court took an improperly narrow

view of fraud, and if the court had applied an appropriately broad standard, their claim

would have survived summary judgment. (Prod. at 39) The Purchasers respond that the

bankruptcy court did analyze the fraud claim under the Producers' more liberal standard,

including their "scheme to defraud" theory. (J. Aron at 51; BP at 28–29) Under either

standard, the Purchasers argue that the evidence uncovered through discovery

demonstrates that the Producers' fraud claim must fail as a matter of law. The Producers

argue that the bankruptcy court ignored that the "factual record . . . clearly alleges the 'unfair

way' by which J. Aron and BP[ ] cheated [them]." (Prod. at 39) They illustrate this theory as

follows:

> Knowing SemGroup was desperate and willing to recklessly gamble on
> derivatives, they protected themselves at the Associated Producers' expense.
> Because of their producer contracts, the SemParties did not have to pay for
> crude oil for up to 50 days after acquiring the crude. J.Aron and BP[ ] entered
> into a scheme with the SemParties to take the Associated Producers' crude oil
> without SemCrude being able to pay. Pursuant to this scheme, the SemParties
> renewed their purchase contracts with the Associated Producers for June and
> July 2008 and took delivery of the Associated Producers' crude oil. When
> renewing the contracts, the SemParties knew or should have known that they
> would be unable to pay for the crude oil.

(Id. at 40).

The court agrees with the bankruptcy court that the Purchasers have demonstrated

an absence of material fact with respect to the Producers' fraud claim. The Producers rely

on testimony from several of the Purchasers' employees establishing that in June and July

of 2008, the Purchasers were aware of the Debtors' financial instability. (Id. at 40–42) This

knowledge by itself, however, does not elevate the Purchasers' sale of financial derivatives

to the level of fraud. The Purchasers could not have known that the Debtors did not actually

pay the Producers for their oil, since the Debtors purchased that oil on credit. At best, the

evidence cited by the Producers indicates that the Purchasers were aware of the Debtors'

14

imminent default, and took unilateral steps to mitigate their potential exposure. Nothing in the record supports the notion that the Purchasers advanced a "false suggestion[,] suppression of truth[,] surprise, trick[], cunning, dissembling [or] unfair way" that allowed them to gain an advantage over the Producers.

Finally, the Producers maintain that the bankruptcy court's proposed FFCL did not adequately consider their claims for aiding and abetting fraud and conspiracy to commit fraud. (Id. at 43) The Producers describe these theories as a variant of the above direct fraud claim: "J. Aron and BP[ ] knew that SemCrude and Eaglwing could not pay producers for their crude oil. Knowing this, they encouraged SemCrude and Eaglwing to post the unpaid-for crude oil as collateral for their derivative trades. In doing so, they conspired and/or aided and abetted SemGroup's underlying fraud." (Id. at 44) For the same reasons that the Producers' direct fraud claim fails, their claims for aiding and abetting fraud, and conspiracy to commit fraud must also fail.

To establish a claim for aiding and abetting fraud, the Producers must bring forth evidence that shows the Purchasers were "generally aware of [their] role as part of an overall illegal or tortious activity at the time that [they] provide[d] the assistance." (Prod. at 43 n. 150) (citing State ex rel. Mays v. Ridenhour, 248 Kan. 919, 919 (Kan. 1991)). Again, because the Producers agreed to sell oil to the Debtors on credit, the Purchasers could not have had knowledge that the oil was unpaid-for. This fact belies any notion that the Purchasers were generally aware of any scheme to use "unpaid-for crude oil as collateral for their derivative trades." (Id. at 44) The Producers, therefore, cannot establish a dispute of material fact necessary to preclude summary judgment on a claim of aiding and abetting fraud.

Additionally, it logically follows that if the Purchasers were not generally aware of any fraudulent scheme purportedly engineered by the Debtors, they could not have reached a

15

"meeting of the minds" with the Debtors to agree to commit that alleged scheme. *See Stoldt v. City of Toronto*, 678 P.2d 153, 156 (Kan. 1984) (noting that a "meeting of the minds" is a necessary element of civil conspiracy). Consequently, the court finds that the entry of summary judgment in favor of the Purchasers on all the Producers' fraud-based claims (direct fraud, aiding and abetting fraud, and conspiracy to commit fraud) is appropriate.

### C. Objection 3: "Buyer for Value" Defense

The Producers object to the bankruptcy court's proposed finding that the Purchasers took the disputed oil free and clear of all liens as buyers for value ("BFV") under § 9-317 of the Uniform Commercial Code ("U.C.C.").[8] The bankruptcy court found that the Purchasers demonstrated all necessary elements of the BFV defense as a matter of law, that: (a) the Producers' purported liens in the oil were unperfected; (b) the Purchasers gave value for the oil; and (c) the Purchasers did not have any actual knowledge of the Producers' alleged security interests. *In re SemCrude, L.P.*, 504 B.R. at 52. The Producers challenge the bankruptcy court's finding with respect to the first and third elements.[9] (Prod. at 56)

### 1. Perfection

The Producers first argue that summary judgment on the BFV defense is improper because certain U.C.C. provisions specific to Kansas and Texas provide them with automatically perfected liens in the oil they delivered to the Debtors.[10] (*Id.*) They contend that the bankruptcy court erroneously found that the Producers' liens are unperfected

---

[8] Unless otherwise specified, the applicable provisions of the Uniform Commercial Code do not vary among the relevant states.

[9] The court confirms that the record easily establishes as a matter of law that the Purchasers gave value for the oil by purchasing it on credit.

[10] The specific statutes at issue are Kan. Stat. Ann. § 84-9-339a ("Kansas U.C.C. § 9-339a") and Tex. Bus. & Com. Code § 9.343 ("Texas U.C.C. § 9.343"). The court will collectively refer to these as the "Automatic Perfection Provisions."

16

because they failed to file U.C.C.-1 financing statements in Delaware or Oklahoma. (*Id.* at 57)  In their view, the Automatic Perfection Provisions of Kansas and Texas provide them with automatically perfected liens in the disputed oil, thus the BFV defense cannot apply. (*Id.*)  A review of the bankruptcy court's earlier decisions, which were incorporated into the proposed FFCL, is necessary.

        In two separate opinions, the bankruptcy court considered whether the Automatic Perfection Provisions granted the Producers a perfected security interest in their oil.  *Arrow Oil & Gas, Inc. v. SemCrude, L.P.*, 407 B.R. 112 (Bankr. D. Del. 2009) (applying Texas law); *Mull Drilling Co. v. SemCrude, L.P.*, 407 B.R. 82 (Bankr. D. Del. 2013) (applying Texas law). Since multiple states had a connection to the case and those states' laws differed on the issue of perfection, the bankruptcy court first conducted a choice of laws analysis in both opinions.  Applying the rule from the Second Restatement, the bankruptcy court concluded that the conflict of laws provision of its own state (Delaware) applied.  *Arrow Oil & Gas, Inc.*, 407 B.R. at 134; *see Mull Drilling Co.*, 407 B.R. at 105.  That provision—6 Del. Code § 9-301(1)—directs that the jurisdiction in which a debtor is located governs the issue of perfection.  All three relevant debtor entities were "located" in either Delaware or Oklahoma; accordingly, the U.C.C. provisions of those states determined whether the Producers had properly perfected their liens.  *See Arrow Oil & Gas, Inc.*, 407 B.R. at 137; *see Mull Drilling Co.*, 407 B.R. at 109.

        It follows that, since the debtor entities were not located in either Texas or Kansas, the Producers could not take advantage of the protection of the Automatic Perfection Provisions.  Delaware and Oklahoma do not contain similar provisions; those states require that a party perfect its lien by filing a U.C.C.-1 financing statement.  *See Arrow Oil & Gas, Inc.*, 407 B.R. at 138; *see Mull Drilling Co.*, 407 B.R. at 110.  Because the Producers did not

17

file a financing statement as required by Delaware or Oklahoma law, they could not demonstrate as a matter of law that they had perfected their liens in the oil.

The Producers do not dispute the reasoning that led the bankruptcy court to conclude that Delaware or Oklahoma law governs the issue of perfection. The Producers, however, do argue that the bankruptcy court's separate reasoning that the Automatic Perfection Provisions must be read in conjunction with U.C.C. § 9-324 is erroneous. (Prod. at 56–57) They claim that this constituted a "major interpretative error" that served "as a foundation to override the automatic perfection rules of the Texas statutes." (*Id.* at 58) This argument implies that the bankruptcy court's conclusion that the Producers' liens were unperfected was predicated upon its decision that U.C.C. § 9-324 applies to liens created by Texas U.C.C. § 9.343 or Kansas U.C.C. § 9-339a. This is not the case. U.C.C. § 9-324 determines the relative priority for purchase money security interests. The bankruptcy court's analysis on this point was independent from its decision to find that Delaware or Oklahoma law—not Texas or Kansas law—controlled the issue of perfection. The bankruptcy court's decision on this issue rested squarely upon a choice of laws analysis. *See Arrow Oil & Gas, Inc.*, 407 B.R. at 137; *see Mull Drilling Co.*, 407 B.R. at 109. The court finds no error in the bankruptcy court's analysis on this point. Whether or not the Automatic Perfection Provisions are subject to § 9-324 has no impact on the bankruptcy court's reasoning that Delaware or Oklahoma law control that issue. The Producers' argument on this point, therefore, is immaterial.

Next, the Producers contend that they sold some oil in Kansas; therefore, Kansas law should govern the effect of perfection for that oil. (Prod. at 59) They argue that, "[a]ssuming *arguendo* that Delaware or Oklahoma law govern whether the Associated Producers' security interests were perfected, Kansas law governs the effect of perfection and priority for crude oil sold in Kansas." (*Id.*) They point out that under U.C.C. § 9-

18

301(3)(C), the location of the oil governs the effect of perfection and priority of perfection. While this is true, it does not impact the analysis. That Delaware or Oklahoma law governs the issue of perfection renders the issue of priority and the effect of perfection irrelevant. There is no dispute that the Producers did not perfect their liens as required under Delaware or Oklahoma law. For the purposes of the BFV defense, it is only necessary to determine whether the liens are perfected or unperfected.

The Producers alternatively argue that Kansas U.C.C. § 9-339a and Texas U.C.C. § 9.343 implicitly exclude the BFV defense from applying to liens created under those sections. (*Id.* at 56, 59) In the Producers' view, because those sections enumerate a list of applicable defenses—and U.C.C. § 9-317 is absent from that list—the BFV defense cannot apply to those liens. (*Id.*) Faced with the identical argument, the bankruptcy court pointed out that both these statutes expressly incorporate the other defenses provided under Article 9: "[t]he rights of any person claiming under a security interest or lien created by this section are governed by the other provisions of [Article 9] except to the extent that this section necessarily displaces those provisions." Texas U.C.C. § 9.343(p); Kansas U.C.C. § 9-339a(o).

The bankruptcy court reasoned that nothing in those statutes "necessarily displaced" the BFV defense. *In re SemCrude, L.P.*, 504 B.R. at 55 n.51; *see Arrow Oil & Gas, Inc.*, 407 B.R. at 112; *see Mull Drilling Co.*, 407 B.R. at 43. Before this court, the Producers invoke the principle of statutory construction that when a statute expressly enumerates specific exceptions, the court should not imply additional exceptions. (Prod. At 56) They argue that the bankruptcy court's interpretation reads the BFV defense into an otherwise exclusive list of exceptions. This principle of statutory interpretation, however, yields to the plain language of the statute. *See Sebelius v. Cloer*, 133 S. Ct. 1886, 1889 (2013) (noting that the court's "inquiry ceases where, as here, the statutory language is unambiguous and

19

the statutory scheme is coherent and consistent."). Although the Automatic Perfection

Provisions do not expressly list the BFV defense, they broadly incorporate other defenses

provided under the U.C.C. *See* Texas U.C.C. § 9.343(p); *see* Kansas U.C.C. § 9-339a(o).

Moreover, the Producers do not offer any explanation of how those statutes necessarily

displace the BFV defense, and this court does not find one. The court rejects this argument

and agrees with the bankruptcy court that Kansas U.C.C. § 9-339a and Texas U.C.C. §

9.343 do not exclude the BFV defense.

### 2. Actual knowledge

The Producers object to the bankruptcy court's recommendation on the final element

of the BFV defense, that the Purchasers did not take the oil with actual knowledge of the

Producers' liens. (Prod. at 60) To support this objection, they assert that the following

pieces of circumstantial evidence create a dispute as to the Purchasers' knowledge, that:

(a) the Purchasers knew that the Debtors purchased oil in Kansas, Texas, and Oklahoma;

(b) the Purchasers knew the identities of some of the specific Producers; (c) the Purchasers

knew that the laws of certain producer states automatically encumbered the proceeds of oil

sales; and (d) the Purchasers knew that Debtors did not pay for the oil. (Prod. at 66–74);

*see In re SemCrude, L.P.*, 504 B.R. at 56.

As explained earlier, the court can dismiss outright the notion that the Purchasers

knew that the Debtors did not pay for the oil. Because the parties do not dispute that the

Debtors purchased the oil from the Producers on credit, the Purchasers could not have

known at the relevant time that the Debtors had not paid the Producers. *See Matter of Gary*

*Aircraft Corp.*, 681 F.2d 365, 374 (5th Cir. 1982) (finding that the date of purchase is the

applicable time for analyzing actual knowledge under the BFV defense).

Accepting the remaining allegations as true, the Producers' theory still fails to create

a disputed issue as to whether the Purchasers had actual knowledge of the Producers'

20

purported liens in the oil. Even if the Purchasers knew where the Producers were located, the lien laws of those states, and the identities of those sellers, there is still no evidence that they actually knew that they had purchased oil from the Debtors subject to the Producers' liens. See U.C.C § 1-202(b) (defining knowledge as "actual knowledge"). Moreover, this argument ignores the fact that the Debtors sold the disputed oil to the Purchasers subject to an express warranty that it was unencumbered. The Producers' theory of the Purchasers' actual knowledge rests solely upon general knowledge of the industry: knowledge of the parties, knowledge of those parties' locations, and knowledge of the applicable laws. This is insufficient to establish "actual knowledge" of a lien under the U.C.C. See U.C.C. § 1-202(b); In re Downey Creations, LLC, 414 B.R. 463, 471 (Bankr. S.D. Ind. 2009) (general knowledge in the industry does not establish actual knowledge of a fact).

Accordingly, the court finds that there is no genuine issue of material fact as to whether the Purchasers took the oil with knowledge of the Producers' liens. The Producers do not provide sufficient evidence that could lead a reasonable jury to find in their favor on this point. See Anderson, 477 U.S. at 247–48. All elements of U.C.C. § 9-317, therefore, are satisfied. The court finds that the bankruptcy court correctly granted summary judgment on the Purchasers' BFV defense.

### D. Objection 4: "Buyer in the Ordinary Course of Business" Defense

The Producers object to the bankruptcy court's proposed finding that the Purchasers also took the disputed oil free and clear of any liens as buyers in the ordinary course of business ("BIOC") under § 9-320(a) of the Uniform Commercial Code. Similar to the BFV defense, the BIOC defense offers a complete and independent defense[11] to the Producers'

---

[11] Although the bankruptcy court could have relied solely on its finding for the BFV defense, in "the interest of completeness and given the time and effort invested by the

asserted lien rights in the oil. *See* U.C.C. § 9-320(a). The bankruptcy court found that the Purchasers satisfied all elements of the BIOC defense because they (a) bought the oil in good faith, (b) without knowledge that the sale violated the rights of the Producers in the goods, (c) in the ordinary course of business, and (d) not in total or partial satisfaction of a money debt. U.C.C. § 1-201(b)(9); *In re SemCrude, L.P.*, 504 B.R. at 61. The Producers challenge the bankruptcy court's recommendation of summary judgment and contend that several of these elements are subject to genuine disputes. (Prod. at 44–45)

### 1. Good faith

The Producers contend that the bankruptcy court incorrectly determined that there is no genuine issue of material fact that the Purchasers bought the oil in good faith. (*Id.* at 48) The facts allegedly demonstrating the Purchasers' lack of good faith are the same alleged facts underlying the Producers' theory of fraud. The Producers claim that "[f]or the reasons discussed in the fraud section, J. Aron and BP[ ] allowed SemCrude to gamble on the derivatives market using the Associated Producers' crude oil as collateral knowing SemCrude would be unable to pay the Associated Producers." (*Id.*) Because the court has already found that the record does not support this factual allegation, it cannot serve as the basis for a lack of good faith. *See supra*, part IV.B. Accordingly, there is no issue of material fact with respect to this element.

### 2. Knowledge that the sale violated the rights of the Producers

The Producers do not express an objection to this point. The bankruptcy court noted that because it had determined that the Purchasers did not take the oil with knowledge of the Producers' liens, it follows that they also could not have taken the oil with knowledge

---

parties into certain of these arguments," the bankruptcy court issued findings on the BIOC defense as well. *In re SemCrude, L.P.*, 504 B.R. at 61. This court has followed suit.

that the sale violated those same security interests. *In re SemCrude, L.P.*, 504 B.R. at 61. This court agrees and adopts that finding.

### 3. Ordinary course of business

The Producers contend that there is a disputed issue of fact as to whether SemGroup sold the oil in the ordinary course of business. (Prod. at 45)   First, under the U.C.C., the BIOC defense is only available if the buyer purchased the goods from "a person in the business of selling goods of that kind." U.C.C. § 1-201(b)(9).  The Producers essentially concede that SemCrude is a seller of oil, but argue that the parent entity, SemGroup, is merely a holding company that does not typically buy or sell oil.  (Prod. at 45) Because J. Aron had purchase contracts with SemGroup (and not SemCrude), the Producers maintain that this presents a genuine issue of material fact.  (*Id.*)

The court rejects this formalistic approach.  Section 1-209(b)(9) refers to the seller as a "person."  U.C.C. § 1-201(b)(9).  The U.C.C. further provides that a "person" is "an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity." *Id.* § 1-201(b)(27).  Black's law dictionary defines "agency" as "[a] relationship that arises when one person (a principal) manifests assent to another (an agent) that the agent will act on the principal's behalf . . . ."  Black's Law Dictionary, Agency (10th ed. 2014).  Further, it defines "instrumentality" as "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Id.*, Instrumentality (10th ed. 2014). Thus, contrary to the Producers' suggestion, the "person" who sells the goods in the ordinary course of business is not necessarily limited to the unitary legal entities that are parties to the transaction.

23

SemGroup owned 99.5% of the equity in SemCrude. (Bank. No. 08-11525, D.I. 3704-9) Further, the Producers do not dispute that, in all cases, either SemGroup or SemCrude actually delivered the oil. (Prod. at 46) Moreover, the Producers acknowledge that SemGroup ultimately received the value of those sales. (Id.) Thus, despite the formal legal distinction between the two entities, the court concludes that the U.C.C.'s definition of "person" is broad enough to encompass the SemGroup-SemCrude relationship for the purposes of the BIOC defense.

Second, the Producers argue that these transactions were not in the ordinary course of business because the Debtors and the Purchasers ultimately set off the oil purchases against the amount owed for the financial derivatives. (Id.) They argue that the bankruptcy court made an unsupported finding of fact that "[i]t is undisputed that the netting agreements between the Downstream Purchasers and the Debtors were customary both in the industry and between these specific parties." (Id.) (citing In re SemCrude, L.P., 504 B.R. at 66) The Producers misconstrue the bankruptcy court's statement. The parties engaged in two layers of "netting" over the course of their relationship.

Since the Debtors bought oil from and sold oil to the Purchasers on credit, the parties agreed to cancel out countervailing oil receivables on a monthly basis. (J. Aron at 8–9; BP at 11) This resulted in a more efficient transaction; each month, only one party would need to pay the remaining balance from the netted oil sales. The Producers do not dispute that oil-for-oil netting is standard in the oil industry. (Prod. at 46–47) In addition to oil-for-oil netting, the parties agreed to engage in another layer of netting, referred to as "cross-product netting." (J. Aron at 9; BP at 11) If a party defaulted under the ISDA Master Agreement, the parties agreed to terminate their relationship and the defaulting party would owe an Early Termination Payment. The parties further agreed that they would net the final balance owed on the physical oil against that Early Termination Payment. (J. Aron at 9; BP

24

at 11; Prod. at 25) Oil-for-oil netting occurred on a monthly basis, whereas cross-product netting only occurred if and when one of the parties defaulted under the ISDA Master Agreement. (Prod., Ex. 13 at § 6)

The bankruptcy court carefully distinguished between the two layers of netting. In the language the Producers cite from the proposed FFCL, the bankruptcy court's use of "netting arrangements" refers only to the netting of physical oil. *In re SemCrude, L.P.*, 504 B.R at 66 n.79. In an accompanying footnote, the bankruptcy court conceded that "[c]ross-product netting may not be as customary as the netting of physical oil . . . ." (*Id.*) While the parties do dispute whether cross-product netting was in the ordinary course of business, it is irrelevant because this netting did not occur until the Debtors defaulted under the ISDA Master Agreement, after the physical oil transactions—the relevant point in time to determine BIOC status. (*See* Prod. at 17; J. Aron at 9) Actions that occur after the sale do not retroactively strip a party of BIOC status. *See In re Pearson Indus., Inc.*, 142 B.R. 831, 843 (Bankr. C.D. Ill. 1992). Additionally, the fact that the parties did trade oil for oil does not render those transactions outside the ordinary course of business since the U.C.C. provides that "[a] buyer in the ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit . . . ." U.C.C. § 1-201(b)(9).

The parties' agreement to net out the outstanding oil balance against the payment that subsequently arose upon default of the ISDA Master Agreement does not affect the Purchasers' BIOC defense. The court concludes that this objection lacks merit and finds that the Purchasers acquired the oil in the ordinary course of business.

#### 4. Not in satisfaction of a money debt

The Producers finally argue that the bankruptcy court improperly determined that there is no disputed issue of fact regarding whether the Purchasers acquired the oil in satisfaction of a preexisting debt. (Prod. at 48) According to U.C.C. § 1-201(b)(9), a "buyer

in the ordinary course of business" excludes any person that "acquires goods . . . as security for or in total or partial satisfaction of a money debt." U.C.C. § 1-201(b)(9). The Producers maintain that the cross-product netting arrangement permitted the Purchasers to acquire oil from the Debtors as collateral for their growing financial derivatives debt. (Prod. at 48) The bankruptcy court rejected this argument, reasoning that because this debt did not arise until the Debtors' default, it was not a preexisting debt at the time of the disputed oil transactions. *In re SemCrude, L.P.*, 504 B.R. at 67

The Producers first take issue with the bankruptcy court's interpretation that the phrase "in total or partial satisfaction of a money debt[,]" refers only to a preexisting debt. U.C.C. § 1-201(b)(9). According to the bankruptcy court's FFCL, the Producers had to demonstrate that the Purchasers acquired the oil as collateral for an already existing debt in order to defeat the BIOC defense. *In re SemCrude, L.P.*, 504 B.R. at 67. The Producers argue that because U.C.C. § 1-201(b)(9) does not explicitly define "money debt" as "preexisting" or "antecedent," the bankruptcy court's interpretation is contrary to the plain language of the statute. (Prod. at 50–51)

The court agrees with the bankruptcy court's interpretation of U.C.C. § 1-201(b)(9). First, as the bankruptcy court noted, there is substantial case law interpreting "money debt" to mean a preexisting or antecedent debt. *In re Mid-Atl. Piping Products of Charlotte, Inc.*, 24 B.R. 314, 323 (Bankr. W.D.N.C. 1982) (referring to money debt for a BIOC defense as "antecedent"); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31174470, at *18 (S.D.N.Y. Sept. 26, 2002) (same); *Ray v. City Bank & Trust Co. of Natchez, Miss.*, 358 F.Supp. 630, 639 (S.D. Ohio 1973) (describing the money debt as "prior"). Further, the court finds persuasive the reasoning of *CIT Grp./Commercial Servs., Inc. v. Constellation Energy Commodities Grp.*, 2012 WL 4603049 (E.D. Ky. Sept. 30, 2012). In *CIT Group*, the U.S. District Court for the District of Kentucky flatly rejected an argument identical to the one

26

presently raised by the Producers. *Id.* at *11. In that case, the debtor coal producer had entered into several agreements with an energy trader. *Id.* at *2. Although the debtor sold coal to the energy trader, the trader also sold coal back to the debtor when the debtor was unable to satisfy delivery obligations to other customers. *Id.* at *3. In their master agreement, the parties agreed to "net any payment obligations between them for the same commodity that were due in the same month." *Id.* Upon the debtor's default, the master agreement provided that the parties would calculate a total termination payment that represented the single net amount due between the parties. *Id.* at *4.

   The debtor's lender held an inventory lien on the debtor's coal and argued that this lien entitled it to superior rights in the coal delivered to the energy trader prior to the debtor's bankruptcy. *CIT Grp./Commercial Servs., Inc.*, 2012 WL 4603049 at *7–8. The energy trader responded that it took the coal free and clear of any liens as a BIOC. *Id.* at *10. The lender countered that the energy company could not qualify as a BIOC because the netting agreement effectively established an ongoing debt, and the trader acquired the coal as security for that debt. *Id.* at *11. The court rejected the lender's position based on a two-step analysis.

   First, the court explained that the netting arrangement at most gave rise to a future debt. "At the time [the energy trader] acquired the coal, [the debtor] had not incurred any debt to [the energy trader]; its debt (the Liquidation and Termination Damages) did not arise . . . until [the debtor's] bankruptcy. As a result, [the energy trader] did not acquire the coal to secure any existing debt." *Id.* Second, the court then determined that because the netting arrangement gave rise to a future debt, as opposed to a preexisting debt, the oil was not acquired as security for a "money debt." *Id.* The court found that the text and logic of U.C.C. § 1-201(b)(9) supports a reading that "money debt" can only refer to a debt that is already in existence:

> A person "acquires goods ... as security for ... a money debt," when the goods are acquired at a time when the debt exists but has not accrued. . . . Put differently, a person who takes goods "as security for" a debt is excluded from being a buyer in the ordinary course of business because he does not give any new consideration for the goods. And without new consideration, the financier's security interest in the inventory is simply extinguished, unable to attach any new value. The U.C.C. thus recognizes that a creditor, who does not provide new value for the goods, should not be able to escape the financier's inventory lien because the financier would be left without any security interest.

*Id.* (citing U.C.C. § 1-201(b)(9)). The court agrees with this reasoning. Contrary to the Producers' argument, a "money debt" for purposes of U.C.C. § 1-201(b)(9) refers to a preexisting or antecedent debt.

The Producers further contend that whether an antecedent debt existed at the time of the oil transactions between the Purchasers and the Debtors is a genuine issue of material fact. (Prod. at 52)  They argue that "J. Aron and BP[ ] 'rolled' their call options with SemCrude, meaning that SemCrude effectively 'renewed' the call option for a fee.  Thus, SemCrude's derivative losses were building month-to-month as price volatility increased." (*Id.*)  They support this argument with a reference to a single BP email, which memorializes BP's potential exposure to the Debtors.  (*Id.*)  This contention does not create a genuine issue of material fact.  The Debtors' **losses** were not growing month-to-month; rather, their potential **exposure** on the financial derivatives was growing.  As the bankruptcy court pointed out, prior to the parties' cross-product netting, the market for oil could have changed course and caused the Purchasers to be liable to the Debtors on the financial derivatives. *In re SemCrude, L.P.*, 504 B.R. at 68.  The debt did not exist until the Debtors defaulted on July 22, 2008.  Up until that point, the Debtors' liability on the derivatives trades was merely projected.  There is no material dispute as to this issue of fact.

Finally, the Producers cannot prove that the Debtors did not receive "new value" from the Purchasers for the oil.  (Prod. at 55)  In order to qualify for a BIOC defense, a purchaser must provide "new value" to the seller.  U.C.C. § 1-201(b)(9); *see Permian*

28

*Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635, 649 (5th Cir. 1991). The Producers

argue that the Purchasers bought the oil on unsecured credit, which cannot establish new

value because they never intended to pay this debt. (Prod. at 55) Instead, in their view, the

Purchasers maintained a "net payable" position to protect against the risk of the Debtors'

default; thus, "by design, accounts receivable owed by J. Aron had no value." (*Id.*) The

court must reject this argument. In the proposed FFCL, the bankruptcy court explains that

the Purchasers provided new value because the purchases of oil increased the Debtors'

accounts receivable. *In re SemCrude, L.P.,* 504 B.R. at 67. According to the U.C.C., a

"buyer in ordinary course of business may buy for cash, by exchange of other property, or

on secured or unsecured credit . . . ." U.C.C. § 1-209(b)(9). The Producers have not

established that the Purchasers' promise to pay for the oil was illusory. Following the

Debtors' bankruptcy, the Purchasers tendered $122 million to the Debtors, which settled its

net obligation for the oil. There is no material dispute that the Purchasers provided "new

value" for the oil according to U.C.C. § 1-201(b)(9). Consequently, the court adopts the

bankruptcy court's finding that the entry of summary judgment on this defense is warranted.

### E. Objection 5: Rights under the Oklahoma PRSA

The Producers next object to the bankruptcy court's proposed legal conclusion that

the Oklahoma Production Revenue Standards Act ("PRSA") does not create a constructive

trust on behalf of the Oklahoma-based Producers. (Prod. at 76) They argue that this

finding is incorrect based on their interpretation of the PRSA, in addition to the written

opinion of the Oklahoma Attorney General. (*Id.* at 80) Alternatively, the Producers suggest

that because the Oklahoma courts had not issued an opinion on the issue (as of the date

they filed their brief), the court should certify the question to the Oklahoma Supreme Court.

(*Id.* at 81) In a separately filed objection, Producer IC-CO, Inc. additionally argues that it

29

has properly pled a common law tort claim based on the Purchasers' violation of a duty imposed by the PRSA. (IC-CO at ¶ 13)

Both objections are overruled. While this matter has been pending, the Oklahoma Court of Appeals issued an opinion directly confronting the PRSA trust issue in *Gaskins v. Texon, L.P.*, 321 P.3d 985 (Okla. Civ. App.), *cert. denied* (Dec. 2, 2013). In *Gaskins*, the court analyzed "whether [PRSA] § 570.10(A) creates a duty on a downstream purchaser . . . to hold revenue or proceeds in an implied trust for the benefit of the legal owner." *Id.* at 988. After reviewing the language of the PRSA, the Oklahoma court found that "nothing in the language of § 570.10(A) creates or suggests a duty on a downstream purchaser or applies to downstream purchasers of oil and gas after it reaches the stream of interstate commerce. Moreover, there is nothing in that language requiring the imposition of an implied trust." *Id.* at 989. In reaching this conclusion, the Oklahoma court drew directly from the bankruptcy court's reasoning in an earlier opinion in this case. *See id.* (citing *Samson Res. Co. v. SemCrude, L.P., et al.*, 407 B.R. 140 (Bankr. D. Del. 2009)). In light of this development, the court agrees that *Gaskins* confirms the bankruptcy court's analysis that the Oklahoma PRSA neither creates any trust rights nor imposes any duty on downstream purchasers. The court will adopt the bankruptcy court's recommendation of summary judgment on these claims.

### F.  Objection 6: Waiver of Lien Rights

The Producers claim that the bankruptcy court erred by finding that they had expressly waived their lien rights. (Prod. at 81) This dispute refers to a footnote in the proposed FFCL, where the bankruptcy court noted that:

> Separate and apart from the Debtors' warranty that the product was free from all liens and encumbrances, some of the Producers sold product to the Debtors pursuant to contracts incorporating the same express warranties of the Conoco General Provisions. The Producers assert that only fifteen Producers used this warranty in their agreements with the Debtors. Accordingly, any Producers who

30

> sold oil under an express warranty that the oil was free of all liens and
> encumbrances have effectively waived any statutory security interest in the oil
> sold.

*In re SemCrude, L.P.*, 504 B.R. at 61 n. 66. The Producers argue that the "express

warranties of the Conoco General Provisions" only apply to liens created by third parties,

not to liens created between the purchaser and seller. (Prod. at 82) Thus, they maintain

that this fact is in dispute and not properly disposed of on summary judgment. The court

finds it unnecessary to address the substance of this argument. Although this point is

disputed, it is not a material fact. As detailed above, the Purchasers have established

complete defenses as either a buyer for value or a buyer in the ordinary course of business.

This footnote was "separate and apart from" the dispositive portion of the bankruptcy court's

reasoning and does not impact the final conclusion. This issue does not foreclose summary

judgment in the Purchasers' favor.

### G. Objection 7: Remaining Common Law Claims

The Producers' final objection relates to various common law claims asserted

against the Purchasers, aside from the fraud-based claims. They recognize, however, that

these claims rely on their purported lien and trust rights. They argue that because "[their]

lien/trust rights survive . . . so do the[ir] common law claims." (*Id.* at 83) The court has

confirmed that, as a matter of law, the Producers acquired the oil free and clear of any liens.

Moreover, the court also found that the PRSA creates no trust rights. The Producers,

therefore, cannot maintain causes of action based on alleged violations of lien or trust

rights. Accordingly, the entry of summary judgment in favor of the Purchasers is

appropriate.

### V. CONCLUSION

For the foregoing reasons, the court overrules all of the Producers' and IC-CO's

objections, and will adopt the bankruptcy court's June 28, 2013 findings of fact and

31

conclusions of law. The court confirms that the Purchasers have demonstrated that there are no disputed issues of material fact and that they are entitled to summary judgment on the Tender Adversaries. An appropriate order shall issue.